1
2
3
4

5          **UNITED STATES DISTRICT COURT**

6          **SOUTHERN DISTRICT OF CALIFORNIA**

7

8    HAMMES COMPANY HEALTHCARE,              CASE NO. 09-CV-2324 JLS (CAB)
     LLC; HC TRI-CITY I, LLC,
9                                            **ORDER: (1) GRANTING IN PART
                                   Plaintiffs,   AND DENYING IN PART
10        vs.                                DEFENDANTS' MOTION FOR
                                             SUMMARY JUDGMENT;
11                                           (2) DENYING PLAINTIFFS' EX
                                             PARTE MOTION FOR LEAVE TO
12   TRI-CITY HEALTHCARE DISTRICT;           FILE SUPPLEMENTAL BRIEF**
     LARRY ANDERSON; PAMELA SMITH; et
13   al.,                                    (ECF Nos. 38, 77)

14                                 Defendants.

15

16        Presently before the Court is Defendants Tri-City Healthcare District, Larry Anderson, and

17   Pamela Smith's motion for partial summary judgment.  (ECF No. 38.)  Also before the Court are

18   numerous responsive pleadings.[1,2]  (ECF Nos. 50–53, 74–75.)  Having considered the parties'

19   arguments and the law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

20

21   _____

22       [1]  After the hearing on Defendants' summary judgment motion, Plaintiffs moved ex parte for
     leave to file a supplemental brief regarding amendment and waiver.  (Mot. to Supplement, ECF No.
23   77.)  Plaintiff submits that a supplemental brief is necessary to "emphasize the evidence presented
     which establishes the non-application of" the ground lease's pre-leasing contingency "and/or the
24   existence of triable issues of material fact."  (*Id.* at 2.) As an initial matter, the Court finds that
     Plaintiffs have not established good cause to warrant supplemental briefing.  *See In re Toys R Us, Inc.,*
25   *Privacy Litig.*, 2001 WL 34517252, at *1 n.1 (N.D. Cal. Oct. 9, 2001) (motion to file surreply requires
     showing of good cause).  Nor is this an instance in which failure to grant Plaintiffs' motion would
26   "result[] in a one-sided adjudication of the merits."  *Uche-Uwakwe v. Shinseki*, 349 F. App'x 136, 138
     (9th Cir. 2009).  Rather, Plaintiffs have had three bites at the opposition apple.  (ECF Nos. 50, 53, 74.)
27   Accordingly, their motion to file a supplemental brief is **DENIED**.

28       [2]  The Court notes that Defendants' reply exceeds by three pages the page limit set by the
     Local Rules.  *See* S.D. Cal. Civ. R. 7.1(h); Reply, ECF No. 52.  Defendants are on notice that future
     noncompliance with the Local Rules will result in appropriate sanctions under Rule 83.1.

**BACKGROUND**

This action arises from the failed development of an outpatient surgery center and medical office building adjacent to the Tri-City Medical Center and Hospital in Oceanside, California (the project). Plaintiff Hammes Company Healthcare, LLC (Hammes) is a healthcare facility design and development company that works with hospitals and medical districts throughout the country. (Opp'n 1, ECF No. 50.) Plaintiff HC Tri-City I, LLC (HC) is a special purpose entity formed for the purpose of leasing the real property upon which the medical office building was to be located and constructing the medical office building. (Beam Decl. ¶ 14, ECF No. 50-2.)

Defendant Tri-City Healthcare District (Tri-City) is a public entity duly organized under California law. Defendants Larry Anderson and Pamela Smith are Tri-City's Chief Executive Officer and Director of Business and Market Development, respectively. (L. Anderson Decl. ¶ 1, ECF No. 38-4; Smith Decl. ¶ 1, ECF No. 38-2.)

In May 2005, Hammes and Tri-City entered into a letter of intent regarding the project's development. (Beam Decl. Ex. 1 (Letter of Intent).) The letter of intent outlined the transaction's proposed terms and directed Hammes to engage in certain pre-construction services related to the project. (*Id.*) The agreement further provided that Tri-City would reimburse Hammes for its initial development costs and pay a breakage fee if, *inter alia*, Tri-City decided at its sole discretion not to proceed with the project. (*Id.* at 6.)

In July 2007, HC entered into a ground lease with Tri-City. (Kibler Decl. Ex. 2 (Ground Lease), ECF Nos. 50-8 to -10.) The ground lease provided that HC would lease for fifty-five years the real property upon which the medical office building was to be located. (*Id.* at 1; *id.* § 2.2.) Relevant here, the ground lease contains three contingencies—two that were waivable at HC's option, and one that was a non-waivable condition precedent to construction of the medical office building. (*Id.* art. 15; *see infra* Part 2.B.1.)

In July 2008, HC entered into a space lease with Pacific View Surgery Center, LLC (Pacific View). (Kibler Decl. Ex. 3 (Space Lease).) Pacific View, a joint venture between Tri-City and its physicians, was to occupy approximately 38% of the medical office building after its completion. (Bournazian Decl. ISO Opp'n Ex. 29 (Gonzalez Dep.), at 84–85, ECF Nos. 50-11 to -18.) Tri-City

also signed the space lease, but did so solely as a guarantor of Pacific View's obligations thereunder. (Space Lease 29.)

For reasons that are in dispute, the project was terminated in early 2009, and Tri-City did not reimburse Hammes or HC for any initial development costs that they incurred. This case and a related one, *Tri-City Healthcare District v. HC Tri-City I, LLC*, Case No. 09-CV-2334 JLS (CAB), ensued. In this case, Hammes and HC assert six claims against Defendants for: (1) breach of the letter of intent, (2) breach of the ground lease and space lease, (3) breach of the implied covenant of good faith and fair dealing, (4) fraud, (5) tortious interference with the space lease, and (6) promissory estoppel. (*See generally* Compl., ECF No. 1.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The movant can carry his burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 324. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S.

at 256.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Rule 56(a) permits a party to move for partial summary judgment.  Under Rule 56(g), the court "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."  "This adjudication . . . serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact."  Fed. R. Civ. P. 56 advisory committee's note (addressing former Federal Rule of Civil Procedure 56(d)).  An order granting partial summary judgment is interlocutory in character; therefore, it is not appealable "prior to the entry of final judgment in the case in the absence of a specific statute authorizing an appeal."  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Ready Pac Foods, Inc.*, — F. Supp. 2d —, 2011 WL 1083374, at *3 (C.D. Cal. Mar. 18, 2011).

## ANALYSIS[3]

Defendants make numerous arguments in support of their motion.  The Court addresses them as they pertain to each claim for relief.

**1.     First Claim for Breach of Contract**

Tri-City contends that summary judgment of Hammes's[4] first claim for breach of the letter of intent is appropriate "because Hammes has not incurred any damages as a proximate cause [sic] of the District's alleged breach of the letter of intent."[5]  (Mem. ISO MSJ 20, ECF No. 38-1.) Specifically, Tri-City contends that (1) all initial development costs were incurred by HC, rather than Hammes; and (2) Hammes is not entitled to a breakage fee because Tri-City did not terminate the

---

[3]  Both parties object to evidence submitted in support of and in opposition to Defendants' summary judgment motion.  Except as specifically addressed herein, the parties' objections are **OVERRULED AS MOOT**.

[4]  The first claim is by Hammes only, against Tri-City only.  (Compl. 3.)

[5]  A threshold question is whether the letter of intent was a binding contract when Tri-City allegedly breached it in 2009.  Tri-City indicates that it is willing to proceed—for the purpose of this motion only—on the assumption that the letter of intent was a binding contract.  (Mem. ISO MSJ 20, ECF No. 38-1.)  However, there is some reason to doubt that this is the case.  (*See, e.g.*, Kibler Decl. Ex. 21 ("[T]he Ground lease replaced and supplanted in its entirety that certain letter of intent . . . executed by Lessor as of June 27, 2005 . . . .").)  Nevertheless, the Court proceeds on Tri-City's assumption that the letter of intent was binding.

- 4 -

1 project.  (*Id.* at 20–21.)

2 Plaintiffs respond that Tri-City committed anticipatory breach of the letter of intent when they

3 bought out the physician–owners of Pacific View and terminated the project.  (Opp'n 12–13.)  Further,

4 Plaintiffs contend that Hammes incurred "extensive fees and costs" separate and addition to any initial

5 development costs incurred by HC.  (*Id.* at 13–14.)  Accordingly, Plaintiffs contend that Hammes is

6 entitled to reimbursement of its initial development costs and a breakage fee.  (*Id.* at 13.)

7 "A claim for breach of contract under California law consists of the following elements: (1) the

8 existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage

9 resulting from the breach."  *Alcalde v. NAC Real Estate Invs. and Assignments, Inc.*, 316 F. App'x

10 661, 662 (9th Cir. 2009) (citing *First Commercial Mortg. Co. v. Reece*, 108 Cal. Rptr. 2d 23, 33 (Cal.

11 Ct. App. 2001)).

12 The letter of intent requires Tri-City to reimburse Hammes for its out-of-pocket initial

13 development costs and pay a breakage fee if Tri-City "decides at its sole discretion not to proceed with

14 the Project."  (Letter of Intent 6.)  Defendants contend that Tri-City "never terminated the letter of

15 intent."  (Opp'n 20.)  According to Defendants, Plaintiffs provided unequivocal notice of their intent

16 to terminate the project on June 30, 2009.  (Smith Decl. ¶ 8; *id.* Ex. 6.)[6]

17 Plaintiffs, however, contend that Tri-City terminated the letter of intent on April 3, 2009, when

18 Defendant Smith told Plaintiffs' representative, Kevin Kraiss, that the project would not proceed.[7]

19 (Kraiss Decl. ¶ 9, ECF No. 50-7.)  In fact, as early as March 17, 2009, Tri-City identified termination

20 of the management agreement with Hammes as a "potential next step" regarding the project.

21 (Bournazian Decl. ISO Suppl. Mem. Ex. A, at 8, ECF Nos. 74-2 to -4.)  Thereafter, on April 30, 2009,

22

23 [6]  The parties agree that exhibit 6 to Defendant Smith's declaration—Plaintiffs' letter purportedly terminating the project—is misdated July 29, 2009.  (Smith Decl. ¶ 7; Opp'n 13.)

24 [7]  Defendants object to consideration of Defendant Smith's statement under Federal Rules of Evidence 401 and 801, and the parol evidence rule.  (Objs. to Kraiss Decl. 5–6, ECF No. 52-7.)

25 Defendants relevance and parol evidence rule objections are utterly baseless, and accordingly, they are **OVERRULED**.  And the Court disagrees with Defendants' contention that Plaintiffs have "not

26 presented any evidence demonstrating that Ms. Smith had any authority" to speak on Tri-City's behalf. (*Id.* at 5.)  Defendant Smith herself declares that she "had many conversations with Hammes

27 representative [sic] Kevin Anderson and Kevin Kraiss regarding the Project."  (Smith Decl. ¶ 11.) Under the circumstances, the Court finds that her statement to Mr. Kraiss that the project would not

28 proceed concerned a matter within the scope of her employment and is imputable to Tri-City.  *See* Fed. R. Evid. 801(d)(2)(D).  Accordingly, Defendants' hearsay objection is also **OVERRULED**.

Tri-City's board of directors approved termination of the project and payment of a portion of Hammes's initial development costs.  (Bournazian Decl. ISO Opp'n Ex. 18.)  On May 28, 2009, Hammes sent a letter confirming its understanding that Tri-City did not intend to proceed with the project.[8]  (Kibler Decl. Ex. 19.)

Viewing this evidence in the light most favorable to Plaintiffs, the Court concludes that a genuine issue of material fact exists as to whether Tri-City unilaterally determined not to proceed with the project, thus obligating it to reimburse Hammes for its initial development costs and pay a breakage fee.  According to Kevin Kraiss, Defendant Smith expressed Tri-City's intent to terminate long before Plaintiffs ever declared the ground lease void.[9]  Although Defendant Smith denies that she ever made such a representation (Smith Decl. ¶ 11), Plaintiffs' assertion is substantiated by Tri-City's own documents.  Among other facts in Plaintiffs' favor, Tri-City's board had no reason to approve termination of the project and payment of Hammes' initial development costs in April 2009—a month before Tri-City received Plaintiff's letter—unless it had already determined not to proceed.

Because a genuine issue of material fact exists as to whether Tri-City unilaterally terminated the project, a genuine issue of material fact also exists as to whether Hammes incurred any damages.  Specifically, if Tri-City decided at its sole discretion not to proceed with the project, then the letter of intent obligated it to pay Hammes a breakage fee.  Failing payment, Tri-City breached the letter of

---

[8]  Defendants contend that Todd Kibler's May 28, 2009 letter to Tri-City was a settlement proposal and thus is inadmissible to prove liability under Federal Rule of Evidence 408.  (Reply 8.)  This objection lacks merit.  "Rule 408 has been interpreted as applicable to an actual dispute, or at least an apparent difference of view between the parties concerning the validity or amount of a claim."  *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir. 1995).  Defendants provide no evidence that Tri-City's liability to Plaintiffs was actually in dispute as of May 28, 2009.  In fact, Tri-City recognized a potential $450,000 liability to Plaintiffs on March 17, 2009 (Bournazian Decl. ISO Suppl. Mem. Ex. A, at 8), and Tri-City's board approved payment in excess of that amount on April 30, 2009 (Bournazian Decl. ISO Opp'n Ex. 18).  Plaintiffs did not take a different view.  (*See* Kibler Decl. Ex. 19 (seeking reimbursement of $435,780.50).)  Accordingly, there is no evidence of an actual dispute that Mr. Kibler's letter could have settled, and Defendants' objection is therefore **OVERRULED**.

[9]  Defendant Anderson allegedly made a similar statement to James Kobayashi on April 22, 2009.  (*See* Kobayashi Decl. ¶ 14, ECF No. 50-6.)  Defendants object to this statement under Federal Rule of Evidence 408 (Objs. to Kobayashi Decl. 10, ECF No. 52-6), but the Court **OVERRULES** this objection for the reasons stated *supra*, note 8.

1   intent, and Hammes suffered damages at least in the amount of the breakage fee.[10]   Accordingly,

2   Defendants' motion for summary judgment of Hammes's first claim is **DENIED**.

3   **2.      Second Claim for Breach of Leases**

4          Tri-City[11] contends that summary judgment of Plaintiffs' second claim for breaches of the

5   ground lease and space lease is appropriate for three reasons.  First, Tri-City contends that Hammes

6   lacks standing to assert claims for breach of the ground lease and space lease because it was not a

7   signatory to either contract.  (Mem. ISO MSJ 9–10.)  Second, Tri-City contends that Plaintiffs failed

8   to satisfy certain conditions precedent to the ground lease and space lease and, accordingly, cannot

9   state a claim for breach of either contract.  (*Id.* at 11–13.)  Third, Tri-City contends that there is no

10  genuine issue of material fact that it did not default on its rent obligation under the space lease.  (*Id.*

11  at 13.)  The Court addresses each contention below.

12  **A.      *Hammes Is Not a Third-Party Beneficiary of the Ground Lease or Space Lease***

13         The parties do not dispute that Hammes did not sign the ground lease or space lease.  (Mem.

14  ISO MSJ 9; *see* Opp'n 19–20.)  However, as the Court recognized in its Order on Defendants' motion

15  to dismiss, "[Hammes] may recover damages from Defendants if [it was] an intended beneficiary" of

16  the ground lease or space lease.  (Order 8, Jan. 28, 2010, ECF No. 14; *see* Cal. Civ. Code § 1559 ("A

17  contract, made expressly for the benefit of a third person, may be enforced by him at any time before

18  the parties thereto rescind it.").)

19         Contract beneficiaries come in two flavors: intended and incidental.  "If the terms of the

20  contract necessarily require the promisor to confer a benefit on a third person," then the third person

21  is an intended beneficiary entitled to enforce the contract.  *Prouty v. Gores Tech. Grp.*, 18 Cal. Rptr.

22  3d 178, 184 (Cal. Ct. App. 2004) (quoting *Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.*, 325 P.2d

23  193, 197 (Cal. 1958)) (internal quotation marks and citations omitted).  "[T]he third person need not

24  be named or identified individually to be an [intended] beneficiary."  *Kaiser Engineers, Inc. v.*

25  ───────────────

26         [10]  Contrary to Tri-City's contention (*see* Mem. ISO MSJ 20), a genuine issue of material fact
    exists as to whether Hammes incurred any initial development costs.  (*See* Cummings Decl. ¶ 3, ECF
27  No. 50-3 (stating that Hammes incurred $333,663 of expenses in developing the project "related to
    pre-construction services and feasability work"); Beam Decl. ¶ 9 (stating that Hammes incurred costs
28  "for feasability studies, conceptual design, and initial approvals for the Project").)

       [11]  The second claim is against Tri-City only.  (Compl. 5.)

*Grinnell Fire Prot. Sys. Co.*, 219 Cal. Rptr. 626, 629 (Cal. Ct. App. 1985).  It is enough that the third person be "a member of the class for whose express benefit the contract was made."  *Id.*

Conversely, "[a] third party who is only incidentally benefited by performance of a contract is not entitled to enforce it."  *E. Aviation Grp., Inc. v. Airborne Express, Inc.*, 8 Cal. Rptr. 2d 355, 357 (Cal. Ct. App. 1992).  "The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.  The contracting parties must have intended to confer a benefit on the third party."  *Nekerovec v. Fredericks*, 87 Cal. Rptr. 2d 856, 865 (Cal. Ct. App. 1999).

"Whether the third party is an intended beneficiary or merely an incidental beneficiary involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered."  *E. Aviation Grp.*, 8 Cal. Rptr. 2d at 357–58; *see also Garcia v. Truck Ins. Exch.*, 682 P.2d 1100, 1105 (Cal. 1984) ("In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of circumstances and negotiations of the parties in making the contract is both relevant and admissible.").  It is a question of fact.  *Prouty*, 18 Cal. Rptr. 3d at 184.  "However, where . . . the issue can be answered by interpreting the contract as a whole and doing so in light of the uncontradicted evidence of the circumstances and negotiations of the parties in making the contract, the issue becomes one of law . . . ."  *Id.*

The purposes of the ground lease and space lease are set forth in the respective recitals.  The ground lease contemplates that the leased premises would be used by HC "for purposes of constructing, owning and operating thereon an ambulatory surgery center and medical office building consisting of approximately 30,000 to 40,000 gross square feet."  (Ground Lease 1.)  And the space lease contemplates that HC would lease certain premises in the medical office building to Pacific View.  (Space Lease 1.)  Under neither agreement was Hammes to receive the right to occupy space in the medical office building or rent payments.  In addition, both leases contain integration clauses stating that the contractual relationships between the parties to the respective agreements constituted the entire understandings between the parties with respect to the matters set forth therein.  (Ground Lease § 14.8; Space Lease art. 2, § 32(e).)  Thus, there is a strong inference that the parties to the

ground lease (Tri-City and HC) and the space lease (HC and Pacific View) did not intend to benefit Hammes.

Nevertheless, Plaintiffs stridently argue that Hammes "was an intended third party beneficiary of both the Ground Lease and the Space Lease." (Opp'n 19.)  According to Plaintiffs, Hammes was an intended beneficiary of the ground lease because "leasing of the land was necessary to allow the Project to be built and for Hammes to continue as the schematic designer of the building." (*Id.* at 3.) Plaintiffs do not explain Hammes was to benefit from the space lease.

The Court concludes that any benefit Hammes was to receive under the ground lease and space lease was purely incidental.  Had the project come to fruition, Hammes presumably only stood to gain from the space lease insofar as rent that its subsidiary—HC—received would ultimately flow through to Hammes.  But the mere fact that a literal interpretation of the space lease would have necessarily resulted in some benefit to Hammes does not entitle Hammes to enforce the agreement where, as here, the record is devoid of any admissible evidence that the parties intended Hammes to benefit from the space lease. *See, e.g.*, *Dayton Dev. Co. v. Gilman Fin. Servs., Inc.*, 419 F.3d 852, 856 (8th Cir. 2005) (holding, under Minnesota law, that third party was not intended beneficiary merely because contract for sale of fixtures required title to pass from seller through third party to buyer).

Moreover, although Hammes contends that execution of the ground lease allowed it "to continue as the schematic designer of the building" (Opp'n 3), Hammes was to receive compensation for its pre-construction services under the letter of intent (*see* Letter of Intent 5–6 (providing for reimbursement of initial development costs, including costs related to "prepar[ing] architectural drawings as required to obtain necessary City entitlements, market the space to prospective tenants and for construction budgeting purposes")).  Plaintiffs provide no basis for the Court to conclude that the parties to the ground lease—HC and Tri-City—intended to compensate Hammes for work beyond what the letter of intent provided for.  In fact, Craig Beam's declaration suggests that *HC* was to perform all work related to the medical office building post-execution of the ground lease. (*See* Beam Decl. ¶ 14 (stating that HC was "the entity to be engaged in the actual ground breaking and construction of the medical office building project").)  That HC would have put Hammes's completed pre-construction services to use in performing its obligations under the ground lease is not a "benefit"

to Hammes sufficient to give it standing to enforce the ground lease.

In support of its argument, Hammes offers up the declarations of Craig Beam, Michael Keller, and Todd Kibler, all of which variously state that "the Ground Lease would benefit Hammes to allow for development of the Project, and Hammes was an intended beneficiary of the Ground Lease." (Beam Decl. ¶ 16; *accord* Keller Decl. ¶ 6, ECF No. 50-5 (same); Kibler Decl. ¶ 4 ("Hammes was nevertheless a beneficiary of the Ground Lease, as leasing of the real property upon which the Project was to be constructed to allow the Project to proceed for the benefit of Hammes.").) Each of these declarations omits critical information, namely, how Hammes was to benefit from further development of the project. There is no evidence of how Hammes was to be paid and by who under either the ground lease or space lease. Thus, Mr. Beam's, Mr. Keller's, and Mr. Kibler's conclusory declarations fail to create a genuine issue of material fact as to whether Hammes was an intended beneficiary under the ground lease or space lease. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence is insufficient to create a genuine issue of material fact.").

Finally, Hammes contends that a flow chart that it provided to Tri-City in 2005 "illustrat[es] that Hammes was an intended third party beneficiary." (Opp'n 19 (citing Bournazian Decl. ISO Opp'n Ex. 36).) At most, this flow chart establishes that Hammes was an equity investor in an "ownership entity" and party to the ground lease, presumably HC. (*See id.*) But the mere fact that Hammes was an equity investor in HC does not establish that it was an intended beneficiary of the ground lease and space lease; if this were true, then every common shareholder of a corporation would be entitled to enforce contracts between the corporation and its customers and suppliers. The law of third-party beneficiaries counsels against such a result. *Nekerovec v. Fredericks*, 87 Cal. Rptr. 2d at 865.

There is no genuine issue of material fact that Hammes is not an intended beneficiary of the ground lease space lease and, accordingly, lacks standing to assert breaches of the agreements. The Court **GRANTS** summary judgment as to Hammes's claim for breaches of the agreements.

//

//

1    ***B.     No Genuine Issue of Material Fact Exists as to Whether Tri-City Breached the Ground***

2          ***Lease Because Failure of the Pre-Leasing Contingency Excused it from Performance***

3          Both the ground lease and the space lease contain certain conditions precedent that had to

4    occur before the agreements took effect.  (*See* Ground Lease §§ 15.1, 15.2, 15.4; Space Lease art. 2,

5    § 31.)  According to Tri-City, the conditions were never met, and accordingly, the agreements were

6    null and void.[12]  (Mem. ISO MSJ 11–13.)  HC, on the other hand, contends that the conditions were

7    waivable at its option, and in any event, they were satisfied.  (Opp'n 14–18.)

8    *(1)    The Ground Lease's Financing and Government Approval Contingencies Were Waivable at*

9          *HC's Option, and the Pre-Leasing Contingency Operated in Favor of HC and Tri-City*

10         "The fundamental goal of contractual interpretation is to give effect to the mutual intention of

11   the parties."  *Byrne v. Laura*, 60 Cal. Rptr. 2d 908, 916 (Cal. Ct. App. 1997).  "When a contract is

12   reduced to writing, the parties' intention is determined from the writing alone, if possible."  *Founding*

13   *Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr.

14   2d 505, 513 (Cal. Ct. App. 1992).

15         The ground lease contains three contingencies that must be satisfied before either party is

16   obligated to perform under the agreement.  (Ground Lease art. 15.)  Section 15.1, the financing

17   contingency, required HC to obtain financing "in form and substance reasonably acceptable to

18   Lessee."  (*Id.* § 15.1.)  If satisfactory financing was not forthcoming, HC could notify Tri-City of its

19   inability to obtain financing and declare the lease null and void based on the contingency, and Tri-City

20   would be on the hook for 50% of HC's initial development costs.  (*Id.*)  However, if HC did not so

21

22         ──────────────

           [12] Tri-City contends that any analysis of whether HC could waive the conditions is controlled
23   by this Court's prior interpretation of the conditions in the related case, *Tri-City Healthcare District
     v. HC Tri-City I, LLC*, Case No. 09-CV-2334 JLS (CAB).  According to Tri-City, "this Court
24   interpreted the Ground Lease to read that these conditions operate in both parties' favor and so long
     as these conditions were not satisfied, neither HC nor the District had any 'binding contractual
25   obligations.'"  (Reply 7 (quoting Order 5, Jan. 27, 2010, 09-CV-2334 ECF No. 13).)  This argument
     lacks merit.  As HC points out (Objection 1, ECF No. 53), the Court also observed, "If [HC] could not
26   obtain financing it could either void the lease by notifying [Tri-City] in writing . . . *or waive the
     condition and proceed*."  (Order 5, 09-CV-2334 ECF No. 13.)  Thus, the Court's order supports HC's
27   argument as much as it supports Tri-City's.  And even if the Court had interpreted the conditions as
     Tri-City claims it did, the Court would be well within its rights to revisit that interpretation here.  *See*
28   Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than
     all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time
     before the entry of a judgment . . . ."); *United States v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986).

notify Tri-City, then the lease remained "in full force and effect" and the contingency would "be deemed to be waived." (*Id.*) This provision is clear on its face—if HC could not obtain satisfactory financing, it could waive the financing contingency, and the lease would remain in full force and effect. Thus, section 15.1 operates solely in HC's favor.

Section 15.4, the governmental approvals contingency, required HC to use "commercially reasonable efforts to obtain all required governmental approvals for the development and construction of the Improvements in the manner intended by" HC. (*Id.* § 15.4.) If HC could not obtain the required governmental approvals, it could notify Tri-City and declare the lease null and void, and again, Tri-City would be on the hook for a portion of HC's initial development costs. (*Id.*) However, if HC did not so notify Tri-City, then the lease remained "in full force and effect" and the contingency would "be deemed to be waived." (*Id.*) Like the financing contingency, the import of this provision is clear—if HC did not obtain the required governmental approvals, it could waive the governmental approvals contingency, and the lease would remain in full force and effect. Thus, section 15.4 also operates solely in HC's favor.

Section 15.2, the pre-leasing contingency, however, is a paradigm of poor draftsmanship, so determining the parties mutual intent is a challenging endeavor indeed. The provision expressly prohibited HC from commencing construction unless it had entered into leases with qualified medical tenants covering at least 70% of the rentable square feet of the medical office building. (*Id.* § 15.2(a).) Although the provision purportedly could be met "at [HC's] sole option," it did not give HC the right to waive the pre-leasing contingency. (*Id.*) In fact, HC could not commence construction until Tri-City consented to the contingency's satisfaction. (*Id.* ("The Pre-Leasing Requirement may be met . . . upon Lessee delivering to Lessor leases covering not less than seventy percent . . . of the rentable square feet of the MOB . . . *and Lessor consenting to the satisfaction of the Pre-Leasing Requirement* . . . ." (emphasis added)).) If HC could not obtain the required leases before December 31, 2007, it had three options: (1) it could give Tri-City the option to enter into a back-up lease (*id.* § 15.2(b)(1)); (2) it could extend the deadline for ninety days (*id.* § 15.2(b)(2)); or (3) it could terminate the lease (*id.* § 15.2(b)(3)).

Ultimately, this provision gave HC two options: satisfy the contingency and obtain Tri-City's

consent to satisfaction, or terminate.  If HC could not obtain the required leases, it could not waive

the contingency because Tri-City retained the right to withhold consent.  Thus, section 15.2 operated

in favor of both parties; if HC failed to satisfy the pre-leasing contingency, neither party was obligated

to perform under the lease.

*(2)*     *Failure of the Ground Lease's Pre-Leasing Contingency Excused Tri-City from Performance*

Because the ground lease's financing and governmental approval contingencies were waivable

at HC's option, HC need not show that they were satisfied to prevail on its breach of contract claim.

Accordingly, the Court only must determine whether the pre-leasing contingency was satisfied.

The pre-leasing contingency is straightforward.  It provides:

> Lessee shall not commence, nor shall Lessee be required to commence, any
> construction at the Ground Leased Premises until such time as Lessee has entered into
> *leases* with Qualified Medical Tenants covering not less than seventy percent (70%)
> of the rentable square feet of the [medical office building], which leases shall include
> a fifteen (15) year triple net lease with a joint venture entity (of which Lessor shall be
> a party) for an approximately 15,000 rentable square foot ambulatory surgery
> center . . . regardless of the total rentable square footage leased . . . . The Pre-Leasing
> Requirement may be met, at Lessee's sole option, upon Lessee delivering to Lessor
> *leases* covering not less than seventy percent (70%) of the rentable square feet of the
> MOB and a statement of Lessee's intent to declare the Pre-Leasing Requirement
> satisfied, and Lessor consenting to the satisfaction of the Pre-Leasing Requirement,
> which consent may not be unreasonably withheld.

(Ground Lease § 15.2(a) (emphasis added).)

HC contends that this condition was satisfied because "by December 2008, HC had

commitments to lease approximately 70% of the [medical office] building."  (Opp'n 17; *accord* K.

Anderson Decl. ¶¶ 5–6, ECF No. 50-1; Kobayashi Decl. ¶¶ 10–11.)  But *commitments to lease* did not

satisfy the pre-leasing contingency—*leases* were required.  (*See* Ground Lease § 15.2(a).)  The

provision explicitly prohibited HC from commencing construction "until such time as [it had] entered

into *leases* with Qualified Medical Tenants" covering at least 70% of the rentable square feet of the

medical office building.  (*Id.* (emphasis added).)  To obtain Tri-City's consent to satisfaction, the

provision required HC to deliver those *leases* to Tri-City.  (*Id.*)  Because HC does not contend that it

entered into leases, and instead relies solely on commitments to lease, no genuine issue of material

fact exists that HC failed to satisfy the pre-leasing condition.

//

//

1    (3)    *HC's Arguments*

2         HC advances two arguments in an attempt to save its claim for breach of the ground lease, but

3    neither is persuasive.

4         First, HC contends that "any analysis of conditions precedent is not appropriate and is

5    irrelevant since the District breached both the Ground Lease and Space Lease in early 2009, before

6    any conditions were even at issue or due." (Opp'n 14.) But by Plaintiffs' own admission, "[t]he pre-

7    leasing contingency was not amended and passed as of December 31, 2007." (Opp'n 4; *accord* Kibler

8    Decl. ¶ 8; Ground Lease § 15.2(b) (setting December 31, 2007 as "initial pre-leasing deadline").) HC,

9    therefore, is wrong on the facts—Tri-City's alleged termination came after the outside date for

10   satisfaction of the pre-leasing condition. Accordingly, an analysis of whether HC satisfied the pre-

11   leasing condition is both appropriate and relevant. Tri-City unequivocally may assert pre-leasing

12   contingency's failure as a defense because the provision expired unsatisfied long before Tri-City

13   allegedly terminated the project.

14        Second, HC contends that Tri-City's April 2009 "statements of termination estop the District

15   from asserting that HC did not fulfill the conditions precedent months after the fact." (Opp'n 18.) HC

16   posits that this is so because "a party is estopped from claiming a failure to perform if the party acts

17   to 'induce forbearance on the part of the promisee or a third person and which does induce such action

18   or forbearance.'" (*Id.* (quoting *Aceves v. U.S. Bank, N.A.*, 120 Cal. Rptr. 3d 507, 515 (Cal. Ct. App.

19   2011)).) But HC's second argument fails for much the same reason as its first. The statements upon

20   which HC bases its estoppel argument were made in early 2009, yet the pre-leasing contingency

21   expired unsatisfied at the end of 2007. Unless Tri-City has a time machine, there is no way that it

22   could have induced HC, in April 2009, not to satisfy a condition due on December 31, 2007. Once

23   again, the laws of physics prevail.

24        There is no genuine issue of material fact that HC failed to satisfy the pre-leasing contingency,

25   and HC's attempts to save its claim fall short.[13] Accordingly, "neither Lessor[—Tri-City—]nor

26   _____

27        [13] Even if the Court addressed Plaintiffs' supplemental arguments regarding amendment and waiver (*see* Mot. to Supplement), it would find them unpersuasive. Regarding the argument that Tri-City, by conduct or implication, waived the pre-leasing contingency (Mot. to Supplement 4–5),

28   Plaintiffs overlook that the ground lease contains an unambiguous "no waivers" provision, so Tri-City could not waive the pre-leasing contingency solely by failing to insist on strict compliance. (*See*

Lessee[—HC—was] obligated to perform any of the promises, covenants or conditions of [the ground lease]," and the ground lease was null and void.  (Ground Lease art. 15; *see also* Cal. Civ. Code § 1439.)  Accordingly, the Court **GRANTS** summary judgment of HC's claim for breach of the ground lease.

### C.  *Failure of the Ground Lease Dooms HC's Claim for Breach of the Space Lease*

HC also contends that Tri-City "specifically defaulted in its rent obligation under the space lease" when it terminated the project.[14]  (*See* Opp'n 14–15.)  Tri-City signed the space lease solely as a guarantor—in the event that Pacific View defaulted, Tri-City agreed to assume "any and all" of Pacific View's obligations under the space lease.  (Space Lease art. 2, § 30; *see also id.* at 29 (Tri-City, signing "[f]or the limited purpose of agreeing to the provisions of Section 30")).)  Thus, Tri-City's only obligation under the space lease was contingent on Pacific View's default.

HC proceeds, as it must, on a theory of anticipatory breach.[15,16]  "Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract.  The repudiation may be express

---

Ground Lease § 14.3 ("No failure by either Lessor or Lessee to insist upon the strict performance by the other of any . . . condition of this Lease, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of such . . . condition.").)  Plaintiffs' second supplemental contention—that two amendments after the pre-leasing contingency's expiration date somehow "modified" the contract (Mot. to Supplement 2–3)—ignores that the amendments expressly indicate that all other terms of the ground lease, including the pre-leasing contingency, "remain[ed] in full force and effect."  Thus, Tri-City could invoke the pre-leasing contingency's failure even after the parties amended the financing and governmental approval contingencies.

[14]  The space lease's financing and governmental approvals contingencies are substantively identical to the ground lease's, and accordingly, they were waivable at HC's option.  (*See* Space Lease art. 2, § 31.)  Thus, HC need not show that the contingencies were satisfied to prevail on its breach of contract claim.

[15]  HC cannot proceed on a theory of *actual* breach—breach after the obligation came due—because Pacific View never defaulted under the space lease, triggering the requirement that Tri-City assume Pacific View's obligations.  This is because the medical office building was never built, and accordingly, Pacific View never was obligated to pay rent.  (*See* Space Lease art. 2, § 2.)  Because Pacific View never had an opportunity to default, Tri-City never had an opportunity to assume Pacific View's obligations.

[16]  According to Defendants, "Plaintiffs have introduced a new argument in their opposition that the District is liable under a theory of anticipatory breach.  This new theory is not disclosed in the complaint herein or its [sic] discovery responses.  If plaintiffs want to amend their complaint to amend this new theory, they should make a formal motion." (Reply 7 (citation omitted).)  Because a separate anticipatory breach claim would be redundant of the breach claim, *see Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 955 F. Supp. 441, 451 (D.V.I. 1997) (striking anticipatory breach claim as redundant of breach claim), the Court disagrees.

09cv2324

or implied.  An express repudiation is a clear, positive, unequivocal refusal to perform; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his contract impossible."  *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 120 Cal. Rptr. 3d 797, 820 (Cal. Ct. App. 2010) (citations omitted) (quoting *Taylor v. Johnston*, 539 P.2d 425, 430 (Cal. 1975)).  "Although it is true that an anticipatory breach or repudiation of a contract by one party permits the other party to sue for damages without performing or offering to perform its own obligations, this does not mean damages can be recovered without evidence that, but for the defendant's breach, the plaintiff would have had the ability to perform."  *Ersa Grae Corp. v. Fluor Corp.*, 2 Cal. Rptr. 2d 288, 295 (Cal. Ct. App. 1991) (citation omitted).

Here, because HC failed to satisfy the ground lease's pre-leasing contingency, HC cannot establish that it would have had the ability to perform its primary obligation under the space lease—construction and delivery of the medical office building.  The space lease did not commence until HC delivered the medical office building to Pacific View.  (*See* Space Lease art. 2, § 2.)  And without the ground lease, HC could not construct the medical office building.  (*See* Ground Lease 1 (indicating that ground leased parcel would be used for the purposes of "constructing, owning and operating thereon," *inter alia*, the medical office building).)  Thus, failure of the ground lease's pre-leasing contingency forever prevented HC from performing under the space lease.  Even if Tri-City breached its guaranty obligation under the space lease, there is no genuine issue of material fact that HC suffered no damages.  Accordingly, the Court **GRANTS** summary judgment of HC's claim for breach of the space lease.

**3.     Third Claim for Breach of Covenants of Good Faith and Fair Dealing**

Defendants contend that Tri-City's arguments for summary judgment of Plaintiffs' second claim apply equally to Plaintiffs' third claim.  (*See* Mem. ISO MSJ 11–13.)  Plaintiffs, for their part, contend that genuine issues of material fact preclude summary judgment of this claim.  (Opp'n 18–19.)

"It is settled that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Locke v. Warner Bros., Inc.*, 66 Cal. Rptr. 2d 921, 925 (Cal. Ct. App. 1997)

1   (internal quotation marks omitted).  "[T]he covenant is implied as a supplement to the express

2   contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other

3   party's rights to the benefits of the agreement."  *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639

4   (Cal. 1995).  A claim for breach of the covenant has five elements under California law: "(1) the

5   parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any

6   conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered

7   with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by

8   the defendant's conduct."  *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D.

9   Cal. 2010).

10       Plaintiffs complain that Defendants breached the implied covenant of good faith as to the letter

11   of intent, the ground lease, and the space lease.  (*See* Compl. ¶ 39.)  The same breach is alleged as to

12   each agreement: "The District implemented a 'plan' to 'buy-out' the collective physician interest in

13   Pacific View, and ultimately destroyed the Space Lease and the Ground Lease."  (Opp'n 18.)

14   Thereafter, Defendants allegedly hid from Plaintiffs their intent to cancel the project.  (*Id.* at 18–19.)

15   The breadth of this argument is problematic, however, because each agreement in issue has its own

16   unique purpose and terms.  Thus, the prohibited conduct varied as to each.  *Carma Developers, Inc.*

17   *v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 727 (Cal. 1992) ("[T]he scope of conduct prohibited by

18   the covenant is circumscribed by the purposes and express terms of the contract.").  Accordingly, the

19   Court addresses each agreement in turn.

20   **A.**   **Defendants Anderson and Smith**

21       As an initial matter, Plaintiffs' claim for breach of the covenant of good faith against

22   Defendants Anderson and Smith fails as a matter of law.  This is because only *parties* to an agreement

23   can be liable for breach the covenant of good faith.  *See, e.g.*, *Waller*, 900 P.2d at 727; *Locke*, 66 Cal.

24   Rptr. 2d at 925.  Because neither Defendant Anderson nor Defendant Smith was a party to the letter

25   of intent, the ground lease, or the space lease, they are not proper targets of a claim for breach of the

26   covenant of good faith.

27   //

28   //

- 17 -

**_B._**        **_Letter of Intent_**

The letter of intent's purpose is set forth—straightforwardly enough—under the heading "Purpose." (Letter of Intent 1.)  Specifically, the letter of intent indicates that it "is not intended, except for the provisions relating to the parties' obligations with respect to the Initial Development Costs, to be a binding agreement but is intended merely as a statement of the present intentions and understandings of the parties and an outline of the economic and business of the proposed transaction to determine whether there is a basis acceptable to parties before proceeding toward final and binding agreements." (_Id._)  The terms set forth in the letter of intent remained subject to further negotiation and did not bind either party. (_Id._)  Thus, by signing the letter of intent, the parties agreed to negotiate in good faith toward final and binding agreements, and Tri-City agreed to reimburse Hammes for its initial development costs. (_See id._ at 5–6.)  Such were the purposes of the agreement—nothing more, nothing less.

Accordingly, the covenant of good faith implied in the letter of intent prohibited Tri-City from (1) undermining Hammes's ability to negotiate in good faith towards a binding agreement and (2) undermining Hammes's ability to incur and obtain reimbursement for its initial development costs. Clearly Tri-City did not do the former, as Tri-City and HC subsequently reached a final, binding agreement embodied in the ground lease.  Nor did Tri-City do the latter.  Hammes does not allege that Tri-City prevented it from engaging in pre-construction activities for which it was to obtain reimbursement; it alleges that Tri-City did not make good on its reimbursement obligation.  While that might amount to a breach of the letter of intent itself, it is not a breach of the covenant of good faith. Accordingly, there is no genuine issue of material fact that Tri-City did not breach the covenant of good faith implied in the letter of intent.

**_C._**        **_Ground Lease_**

The Court also concludes that Tri-City did not breach the covenant of good faith implied in the ground lease.  To prevail on a claim for breach of the covenant, the plaintiff must establish, _inter alia_, that it satisfied any conditions precedent to the defendant's performance. _Rosenfeld_, 732 F. Supp. 2d at 968.  As discussed _supra_, there is no genuine issue of material fact that HC failed to satisfy the pre-leasing contingency, which was a condition precedent to Tri-City's performance.  Accordingly,

1    Plaintiffs' claim for breach of the ground lease's implied covenant of good faith fails as a matter of

2    law.

3    **D.    *Space Lease***

4          Finally, the Court concludes that HC's failure to satisfy the ground lease's pre-leasing

5    contingency spells disaster for its claim for breach of the implied covenant of good faith as to the

6    space lease.  Under California law, a plaintiff must prove damages to prevail on a claim for breach of

7    the covenant of good faith.  *Rosenfeld*, 732 F. Supp. 2d at 968.  As discussed *supra*, there is no

8    genuine issue of material fact that HC was not damaged by Tri-City's alleged breach of covenant of

9    good faith implied in the space lease because HC failed to satisfy the ground lease's pre-leasing

10   contingency.  The failure of the ground lease's pre-leasing contingency prevented HC from building

11   the medical office building, which construction was a condition precedent to Pacific View's rent

12   obligation under the space lease.  Thus, even if Tri-City breached the covenant of good faith implied

13   in the space lease by implementing an undisclosed plan to terminate the project, this breach did not

14   damage HC because failure of the ground lease's pre-leasing contingency forever prevented HC from

15   bringing the project to fruition and obtaining the space lease's benefits.  Accordingly, Plaintiffs' claim

16   for breach of the covenant of good faith implied in the space lease also fails as a matter of law.

17         There is no genuine issue of material fact that HC cannot prevail on its claim for breach of the

18   covenant of good faith.  Accordingly, Court **GRANTS** summary judgment as to Plaintiffs' third claim.

19   **4.    Fourth Claim for Fraud**

20         Defendants Anderson and Smith[17] advance several arguments for summary judgment of

21   Plaintiffs' fourth claim for fraud.  (*See* Mem. ISO MSJ 14–17; Reply 11–15.)  Plaintiffs, however,

22   graphically assert that "Larry Anderson and [Pamela] Smith engaged in fraud and material omissions

23   when they formulated a 'plan' to *dismember* Pacific View and attempt to take Plaintiffs' construction

24   drawings and governmental approvals without any compensation."  (Opp'n 20 (emphasis added).)

25         "The elements of fraud, which gives rise to the tort action for deceit, are [1] misrepresentation

26   (false representation, concealment, or nondisclosure); [2] knowledge of falsity (or 'scienter');

27   [3] intent to defraud, i.e., to induce reliance; [4] justifiable reliance; and [5] resulting damage."  *Small*

28

---

[17]   The fourth claim is against Defendants Anderson and Smith only.  (Compl. 10.)

1    *v. Fritz Cos.*, 65 P.3d 1255, 1258 (Cal. 2003) (internal quotation marks omitted).

2           Problematically, the theory of fraud alleged in the complaint diverges markedly from that

3    outlined in Plaintiffs' opposition to Defendants' motion.  The complaint alleged that Defendants

4    Anderson and Smith committed fraud by repeatedly communicating to Plaintiffs that the project would

5    go forward, even after Defendants had determined not to go forward with the project.  (*See* Compl.

6    ¶¶ 48–49.)  One can easily discern how Plaintiffs planned to establish reliance and damages in that

7    scenario—in reliance on Defendants' false assurances that the project would go forward, they

8    continued to incur initial development costs and were damaged in that amount.[18]  Now, however,

9    Plaintiffs are relying on a theory of fraud that, while featured in the complaint, played only a minor

10   role.  (*See* Compl. ¶ 50.)  Specifically, Plaintiffs allege that Defendants committed fraud by

11   representing to Plaintiffs that "the District would not utilize the Hammes and HC design documents

12   for any future medical office building" when, in actuality, Defendants "had already determined to

13   utilize Plaintiffs' design and construction documents and still attempt to build the surgery without

14   Plaintiffs."  (Opp'n 21.)  For the reasons detailed below, the Court concludes that Plaintiffs cannot

15   establish the necessary elements of reliance or damages under this theory.

16   **A.    *There Is No Genuine Issue of Material Fact that Plaintiffs Did Not Actually Rely on***

17   ***Defendants' Alleged Misrepresentations***

18          To prevail on a fraud claim, "[t]he plaintiff must allege and prove that he actually relied upon

19   the misrepresentations, and that, in the absence of fraud, would not have entered into the contract or

20   other transaction."  *Mega Life & Health Ins. Co. v. Superior Court*, 92 Cal. Rptr. 3d 399, 406 (Cal.

21   Ct. App. 2009).  "Actual reliance occurs when the defendant's misrepresentation is an immediate

22   cause of the plaintiff's conduct, altering his legal relations, and when, absent such representation, the

23   plaintiff would not, in all reasonable probability, have entered into the transaction."  *Cadlo v. Owens-*

24   _____

25          [18]   Notably, there is evidence that Tri-City determined to terminate the project as early as
     March 17, 2009.  (Bournazian Decl. ISO Suppl. Mem. Ex. A.)  However, Plaintiffs fail to identify any

26   contemporaneous contrary representations by Defendants Anderson or Smith that would support a
     fraud claim.  Nor have Plaintiffs established that they and Defendants Anderson and Smith shared the

27   requisite relationship that would have imposed upon Defendants Anderson and Smith a duty to
     disclose their intent not to proceed with the project.  "[S]uch a relationship can only come into being

28   as a result or some sort of *transaction* between the parties."  *LiMandri v. Judkins*, 60 Cal. Rptr. 2d
     539, 543 (Cal. Ct. App. 1997).  Neither Defendant Anderson nor Defendant Smith was a party to any
     transaction relevant to Plaintiffs' claims.

1   *Ill., Inc.*, 23 Cal. Rptr. 3d 1, 5 (Cal. Ct. App. 2004).  Reliance may be inferred from the circumstances

2   attending the transaction.  *Boeken v. Philip Morris Inc.*, 26 Cal. Rptr. 3d 638, 653 (Cal. 2005).

3           Here, Plaintiffs' representatives variously declare that they relied on Defendants Anderson and

4   Smith's assertions that they did not intend to proceed with the project.  (*See* K. Anderson Decl. ¶ 19;

5   Kraiss Decl. ¶ 14.)   However, Plaintiffs entirely fail to identify *how* they relied on Defendants'

6   statements—they do not identify a change in their legal relations that would not have occurred but for

7   Defendants' alleged misrepresentations.  Nor can the Court infer a change in economic position from

8   the circumstances attending the transaction.  When Defendants informed Plaintiffs of their intent to

9   terminate the project, Plaintiffs ceased working on the project.  It is difficult to fathom that Plaintiffs

10  would have acted differently had Defendants disclosed their intent to continue the project without

11  Plaintiffs.  Absent some evidence that they would have acted differently but for Defendants' alleged

12  misrepresentations, Plaintiffs' fraud claim must fail.  *See Wilkins v. Nat'l Broad. Co.*, 84 Cal. Rptr.

13  2d 329, 338 (Cal. Ct. App. 1999).

14  **B.      *Even if Plaintiffs Relied, There Is No Genuine Issue of Material Fact that Defendants Did***

15  ***Not Suffer Damages***

16          Plaintiffs also fail to establish that they suffered damages on account of Defendants Anderson

17  and Smith's alleged misrepresentations regarding their intent to proceed with the project.  According

18  to Plaintiffs' controller, Debra Cummings, Plaintiffs incurred $88,040 in costs that they would not

19  have incurred if Defendants had terminated the project on March 10, 2009.  (Cummings Decl. ¶ 5.)

20  However, the damages alleged in Ms. Cummings's declaration only are relevant to the theory of fraud

21  alleged in the complaint, a theory that fails for the reasons stated *supra*, note 18.  Plaintiffs offer no

22  evidence to establish that they were damaged by Defendants' alleged failure to disclose their intent

23  to continue the project without Plaintiffs, which occurred in April 2009.  Conspicuously absent from

24  the Plaintiffs' pleadings is any allegation that Defendants Anderson and Smith actually did convert

25  Plaintiffs' construction documents for their own use.  Accordingly, there is no genuine issue of

26  material fact that Plaintiffs were not damaged by Defendants alleged fraud.

27          Because there is no genuine issue of material fact that Plaintiffs cannot establish at least two

28  necessary elements of their fraud claim, the Court **GRANTS** summary judgment as to this claim.

**5.      Fifth Claim for Tortious Interference with the Space Lease**

Defendants contend that HC[19] cannot prevail on its claim for tortious interference with the space lease because HC's termination of the ground lease was the proximate cause of any damages HC incurred.  (Mem. ISO MSJ 19.)  Although the Court agrees that HC was not damaged by any alleged tortious interference with the space lease, it reaches that conclusion for a different reason.

A tortious interference with contractual relations claim has five elements: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589–90 (Cal. 1990).

Even if Defendants interfered with the space lease, HC was not damaged.  As discussed *supra*, this is because failure of the ground lease's pre-leasing contingency prevented HC from realizing any benefits under the space lease.  Accordingly, there is no genuine issue of material fact that HC was not damaged by any alleged interference with the space lease, and the Court **GRANTS** summary judgment as to this claim.

**6.      Sixth Claim for Promissory Estoppel**

Defendants contend that summary judgment of Plaintiffs' sixth claim for promissory estoppel is appropriate because "Plaintiffs have offered no evidence that their economic position changed following the April 2009 meeting with Ms. Smith and Mr. Anderson . . . ."  (Reply 15.)  Plaintiffs, however, assert that triable issues of material fact exist as to this claim.  (Opp'n 24–25.)

"Promissory estoppel applies whenever a promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance would result in an injustice if the promise was not enforced." *Aceves*, 120 Cal. Rptr. 3d at 515 (internal quotation marks omitted).  "Cases have characterized promissory estoppel claims as being basically the same as contract actions, but only missing the

---

[19] The fifth claim for tortious interference with the space lease is brought by Hammes and HC. (Compl. 12.)  However, as the Court concluded *supra*, there is no genuine issue of material fact that Hammes was not an intended beneficiary of the space lease.  Accordingly, the Court addresses the tortious interference claim as to HC only.

1   consideration element." *US Ecology, Inc. v. California*, 28 Cal. Rptr. 3d 894, 906 (Cal. Ct. App.

2   2005).

3         Like Plaintiffs' fraud theory, the promissory estoppel theory advanced in the complaint differs

4   from that asserted in opposition to Defendants' motion.  The complaint alleges that Defendants

5   "repeatedly promised and reassured Plaintiffs that the Project would proceed" (Compl. ¶ 59), "all the

6   while never intending to proceed" (Compl. ¶ 61).  Now, however, Plaintiffs allege that they relied on

7   Defendants Anderson and Smith's "representations of termination and promises of payment of at least

8   $450,000." (Opp'n 25.)  Plaintiffs contend that they "expressly relied upon these promises, and

9   understood the Project was terminated, they should cease all work, and yet payment would be made

10  to them." (*Id.*)

11        Plaintiffs' new theory simply does not support a promissory estoppel claim.  Even if

12  Defendants gratuitously promised to pay Plaintiffs $450,000, Plaintiffs fail to identify any "substantial

13  change of position, either by act or forbearance, in reliance on [the] promise." *Youngman v. Nev.*

14  *Irrigation Dist.*, 449 P.2d 462, 468 (Cal. 1969).  Plaintiffs' representative's statement that he "relied

15  on the District's termination" is plainly insufficient because it does not identify *how* Plaintiffs position

16  changed. (Kraiss Decl. ¶ 22.)  In fact, it is difficult to fathom what "acts or forbearance" on Plaintiffs'

17  part could have resulted from Defendants' alleged promise.  Plaintiffs had already stopped working

18  on the project; they couldn't "stop more."   Because Plaintiffs have failed to identify a substantial

19  change of position in reliance on Defendants' allegedly gratuitous promise, the Court **GRANTS**

20  summary judgment of Plaintiffs' promissory estoppel claim.

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1

**CONCLUSION**

2        For the reasons stated, the Court the Court **GRANTS** Defendants' motion for partial summary

3   judgment as to Plaintiffs' claims for breach of the ground lease and space lease, breach of the implied

4   covenant of good faith and fair dealing, fraud, tortious interference with the space lease, and

5   promissory estoppel.  The Court **DENIES** Defendants' motion for partial summary judgment as to

6   HC's claim for breach of the letter of intent.

7        **IT IS SO ORDERED.**

8

9   DATED:  July 11, 2011

10                                                   _____
                                                     Honorable Janis L. Sammartino
11                                                   United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28