1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT
9             SOUTHERN DISTRICT OF CALIFORNIA
10
11  HAMMES COMPANY                    )   Case No. 3:09-cv-2324-GPC-KSC
    HEALTHCARE, LLC, a Wisconsin      )
12  limited liability company, and HC TRI-  )   **FINDINGS OF FACT AND**
    CITY I, LLC, a Wisconsin limited  )   **CONCLUSIONS OF LAW**
13  liability company,                )   **FOLLOWING BENCH TRIAL**
                                      )
14                Plaintiffs,         )
    v.                                )
15                                    )
    TRI-CITY HEALTHCARE               )
16  DISTRICT, a California public entity,  )
    et al.                            )
17                                    )
                  Defendants,         )
18  _____  )
19
20                  **INTRODUCTION**
21       On August 19, 2013, the Court concluded a four-day bench trial on plaintiff
22  Hammes Company Healthcare, LLC's ("Hammes") claim for breach of a letter of intent
23  ("LOI") pertaining to the development of a medical office building and ambulatory
24  surgery center on defendant Tri-City Healthcare District's ("District") hospital campus
25  in Oceanside, California ("Project").
26       Hammes asserts the District unilaterally terminated the Project or, at a minimum,
27  frustrated Hammes' efforts at bringing the Project to fruition. Hammes therefore seeks,
28  under the terms of the LOI, its initial development costs and a breakage fee for the

work it completed prior to the Project's termination.

Following trial, the Court ordered Hammes and the District to submit their closing arguments in writing, which they did.  (ECF Nos. 187, 189, 190.)  After considering all the evidence admitted at trial, the parties' arguments, and the applicable law, the Court finds in favor of the District.

More specifically, the Court finds that, while the parties intended the Initial Development Costs provision of the LOI to be enforceable, the parties intended the later executed Ground Lease to supersede the LOI.  In reaching this conclusion, the Court concludes that Hammes and the entity it created to be the owner of the Project, HC Tri-City I, LLC ("HC"), should be treated as the same party under the alter ego doctrine.  Thus, because the Court finds that the Initial Development Costs provision of the LOI became unenforceable upon execution of the Ground Lease, the Court does not address the issues of breach or damages.

## BACKGROUND

### I.     Summary Judgment

Prior to trial, both the District and Hammes moved for summary judgment.  In December 2010, the District moved for partial summary judgment as to the first through sixth claims (out of seven total claims) asserted against it. (ECF No. 38.) The first claim (breach of the LOI) was asserted against the District by Hammes alone.  The second through seventh claims were asserted against the District by Hammes and by plaintiff HC—the entity formed by Hammes to develop, own, and lease the Project.

In July 2011, prior to this case's transfer to the undersigned judge, the Honorable Janis L. Sammartino, U.S. District Judge, granted the District's Motion for Summary Judgment as to Hammes' and HC's second through sixth claims against the District. (ECF No. 85.)  Thus, Hammes's first claim (breach of the LOI), along with Hammes' and HC's seventh claim (declaratory relief), were the only claims remaining after Judge Sammartino's July 2011 Order. This Court later dismissed Hammes' and HC's seventh claim for declaratory relief in December 2012, leaving Hammes' first claim for breach

1  of the LOI as the only remaining claim to be tried.  (ECF No. 147.)

2      With regard to Hammes' claim for breach of the LOI, Judge Sammartino noted

3  that "[a] threshold question is whether the letter of intent was a binding contract when

4  [the District] allegedly breached it in 2009."  (ECF No. 85 at 4 n.5.)  At the District's

5  insistence, Judge Sammartino proceeded under the assumption—for purposes of

6  Deciding the District's Motion for Summary Judgment—that the LOI was a binding

7  contract.  (Id.)  She noted, however, that "there is some reason to doubt that this is the

8  case."  (Id. (emphasis added).)

9      Under the assumption that the LOI was a binding contract, Judge Sammartino

10  found a genuine issue of material fact existed as to whether the District unilaterally

11  terminated the project, thus obligating it to reimburse Hammes for its initial

12  development costs and to pay a breakage fee.  (Id. at 6.)

13      Thereafter, in September 2011, Hammes moved for summary judgment as to its

14  first claim for breach of the LOI.  (ECF No. 92.)  Relying on the analysis set forth in

15  her July 2011 Order, Judge Sammartino denied Hammes' Motion for Summary

16  Judgment.  (ECF No. 110 at 29-31.)  That is—without addressing whether the LOI is

17  a binding agreement—Judge Sammartino found that a genuine issue of material fact

18  existed as to whether "either party 'decided' not to proceed with the project or the

19  ambulatory surgery center under the terms of the [LOI]."  (Id. at 31.)

20  **II.    Hammes' Claim for Relief**

21      In its only remaining claim after summary judgment, Hammes alleges that, in

22  May 2005, it entered into a written agreement with the District to proceed with the

23  development of an out-patient services and medical office building adjacent to an

24  existing medical center operated by the District ("Project").  (ECF No. 1, Compl. ¶¶ 11,

25  14.)

26      Hammes claims the agreement "expressly included provisions related to

27  Hammes' and [the District]'s obligations with respect to 'Initial Development Costs,'

28  which would be binding and operate as a final expression of the parties' obligations."

(Id. ¶ 14.)  The alleged agreement, attached as Exhibit A to Hammes' Complaint (and admitted at trial as Trial Exhibit 1), is entitled: "Letter of Intent" ("LOI").

Hammes alleges that, pursuant to the LOI, Hammes would be reimbursed for its "Initial Development Costs" regardless of whether the Project proceeded.  (Id. ¶ 16.) Hammes claims that, under the LOI, "if the Project failed to come to fruition, including the construction of the out-patient services and medical office building, along with leasing of such, then 'the District agree[d] to reimburse one hundred percent (100%) of,' Plaintiff Hammes' Initial Development Costs."  (Id. ¶ 17.)

Hammes further claims the District "also agreed that if the Project should not be completed or was terminated by the District, then the District shall pay Plaintiff a breakage fee . . . in addition to the Initial Development Costs."  (Id. ¶ 18.)  Hammes alleges the parties agreed to a breakage fee of $10,000 per month for each month Hammes spent working on the Project.  (Id.)

Hammes claims it fully performed under the LOI, except those obligations that the District waived, excused, or prevented from being performed.  (Id. ¶ 19.)

Hammes alleges the District breached the LOI "by solely determining not to proceed with the Project, and thus frustrating Hammes' intention to proceed with long-term development and leasing of the Project.  (Id. ¶ 20.)

Hammes asserts the LOI was never superseded or altered by Hammes and the District.  (Id. ¶ 21.)

Hammes claims it "has damages unique to it, which entitles [Hammes] the agreed upon Initial Development Costs and Breakage Fees" in an amount Hammes believes to exceed $1,000,000, "plus loss of use of funds, fees, costs, and interest as allowed by contract and/or law."  (Id. ¶¶ 22-23.)

## **FINDINGS OF FACT & CONCLUSIONS OF LAW**

To succeed on a breach of contract claim, a plaintiff must prove (1) the existence of an enforceable contract, (2) the plaintiff's performance or excuse for nonperformance under the contract, (3) the defendant's material breach of the contract,

and (4) resulting damages to the plaintiff.  <u>Reichert v. Gen. Ins. Co. of Am.</u>, 68 Cal. 2d 822, 830 (1968).

## I.    Enforceable Contract

Hammes argues the LOI is an enforceable contract with regard to the Initial Development Costs and Breakage Fee provisions.  (ECF No. 187 at 6.)  The District argues the LOI is no longer an enforceable contract because it was superseded by the Ground Lease.  (ECF No. 189 at 4.)

The Court will address these arguments, but first, some explanation about letters of intent in general:

> "Letter of intent" is not a legal term of art.  The term is seen in real estate development documents, securities underwriting, and sales of corporate assets, among other areas.  Generally, "letter of intent" refers to a writing documenting the preliminary understandings of parties who intend in the future to enter into a contract.

<u>Rennick v. O.P.T.I.O.N. Care, Inc.</u>, 77 F.3d 309, 315 (9th Cir. 1996) (citing <u>A/S Apothekernes Laboratorium v. I.M.C. Chem. Grp., Inc.</u>, 873 F.2d 155, 158 (7th Cir. 1989); Black's Law Dict. at 814 (5th ed. 1979)).

"The purpose and function of a preliminary letter of intent is not to bind the parties to their ultimate contractual objective.  Instead, it is only to provide the initial framework from which the parties might later negotiate a final . . . agreement, if the deal works out."  <u>Rennick</u>, 77 F.3d at 315 (internal quotation marks omitted) (citing <u>A/S Apothekernes</u>, 873 F.2d at 158).  Thus, "calling a document 'letter of intent' implies, unless circumstances suggest otherwise, that the parties intended it to be a nonbinding expression in contemplation of a future contract, as opposed to its being a binding contract."  <u>Rennick</u>, 77 F.3d at 315.

Here, the LOI reflects the above principles, as it expressly states it "is not intended . . . to be a binding agreement, but is intended merely as a statement of the present intentions and understandings of the parties."  (Trial Ex. 1 at 1.)  With this in mind, the Court examines whether the Breakage Fee and Initial Development Costs provisions are binding and enforceable.

**A.    Breakage Fee Provision**

The LOI provides it "is not intended, <u>except for the provisions relating to the parties' obligations with respect to the Initial Development Costs</u>, to be a binding agreement." (Trial Ex. 1 at 1 (emphasis added).) The LOI states it "is intended merely as a statement of the present intentions and understandings of the parties and an outline of the economic and business terms of the proposed transaction to determine whether there is a basis acceptable to the parties before proceeding toward final and binding agreements."

Considering the LOI's express language, the Court is unable to conclude the LOI is binding with regard to the Breakage Fee provision because the LOI unambiguously states it is binding only "with respect to the Initial Development Costs."  While the Breakage Fee provision immediately follows the Initial Development Costs provision in the LOI, the Court finds the two provisions to be distinct.

First, the Breakage Fee provision begins with the language: "In addition to the reimbursement of out-of-pocket Initial Development Costs . . . ." (Trial Ex. 1 at 6.) The "in addition to" language—instead of, for example, "included in" language—implies the two provisions were included separately and for different reasons.

Second, the Initial Development Costs provision expressly limits "Initial Development Costs" to "reasonable, out of-of-pocket costs paid by [Hammes] to <u>third parties</u>." (Trial Ex. 1 at 6 (emphasis added).)  Thus, because a breakage fee is not a cost paid to third parties, it falls outside the express definition of "Initial Development Costs."

Third, while the Breakage Fee provision uses the mandatory term "shall" with regard to the District's supposed obligation to pay a breakage fee, the term "shall" is used at least eleven other times in provisions that neither party asserts are binding. (Trial Ex. 1 at 2, 3, 4.)  Thus, the use of the word "shall" in the Breakage Fee provision does not necessarily make the provision binding.

Turning to the testimony offered at trial, the Court examines whether the parties intended the Breakage Fee provision to be binding. While testifying about whether letters of intent are binding, Keven Kraiss (the senior vice president of Hammes at the time the parties executed the LOI) stated: "They are binding, specifically called out with respect to which section of the letter of intent are binding, and that typically does relate to initial development costs." (ECF No. 188 at 8.) Thus, Kraiss did not testify as to whether the Breakage Fee provision is binding. Instead, he affirmed that letters of intent typically state which specific provisions are binding. Thus, one may reason that, if the parties intended the Breakage Fee provision to be binding, it would have been specifically stated in the LOI's introductory paragraph, along with the language regarding Initial Development Costs.

Like Kraiss's testimony, the testimony of Dr. Arthur Gonzalez (the president and CEO of the District at the time the parties executed the LOI) is of no help to Hammes. Dr. Gonzalez only testified generally that he considered the LOI to be a binding agreement. (See ECF No. 188 at 50.) He did not explain or expand on the LOI's introductory paragraph stating that only the Development Costs provision is binding.

In short, neither party submitted evidence that, in the Court's view, would contradict the plain and unambiguous language of the LOI's introductory paragraph that it was intended to be binding only with regard to the Initial Development Costs provision. See Wolf v. Super. Ct., 114 Cal. App. 4th 1343, 1351 (2004) ("The trial court's determination of whether an ambiguity exists is a question of law.") The Court thus turns to whether the LOI is binding with regard to the provision that the parties clearly intended to be binding.

**B.    Initial Development Costs Provision**

The Court finds, based on the unambiguous language of the LOI and the testimony offered at trial, that the parties intended the Initial Development Costs provision to be binding. This conclusion, however, does not end the inquiry of whether this provision is enforceable.

"It is a basic principle of California contract law that an agreement cannot be an enforceable contract unless it is supported by consideration." Am. Guarantee & Liability Ins. Co. v. Lexington Ins. Co., 517 F. App'x. 599, 600 (9th Cir. 2013) (citing Forgeron Inc. v. Hansen, 149 Cal. App. 2d 352, 360-61 (1957). "Consideration may be either a benefit conferred or agreed to be conferred upon the promisor or some other person, or a detriment suffered or agreed to be suffered by the promise or some other person." Am. Guarantee & Liability Ins. Co., 517 F. App'x. at 600 (citing Cal. Civ. Code § 1605).

The Initial Development Costs provision states: "Upon execution of this Letter and subsequent written District approval, [Hammes] and District will jointly begin the initial development process." Thus, at first blush, it appears both parties promised to undertake efforts they were not otherwise required to undertake, i.e., beginning the initial development process. As such, it appears the Initial Development Costs provision is supported by adequate consideration. The provision, however, continues:

> The initial development process will entail incurring out-of-pocket costs related but not limited to the following activities: (i) prepare architectural drawings . . . , market the space . . . ; (ii) have civil engineering analysis performed . . . ; (iii) have a traffic study prepared . . . ; (iv) have an environmental assessment conducted . . . ; (v) engage legal assistance to assist with public and regulatory approvals . . . ; (vi) pursue letters of intent or leases with prospective physician tenants . . . ; (vii) prepare boundary surveys and parcel maps . . . ; (viii) perform soils engineering studies . . . ; (ix) incur municipal submittal fees . . . ; (xi) engage a general contractor . . . ; and (xii) engage an attorney for the completion of all legal documentation related to the project . . . .
>
> Costs related to these activities, along with other reasonable out-of-pocket initial development costs that have been pre-approved by District in writing shall be collectively referred to as "Initial Development Costs". The "Initial Development Costs" shall be limited to reasonable, out-of-pocket costs paid by [Hammes] to third parties.
>
> [Hammes] will fund the Initial Development Costs as they are incurred.

(Trial Ex. 1 at 5-6 (emphasis added).)  It is clear from the remainder of the provision that, despite the introductory language that both parties would "jointly begin the initial development process," only Hammes was expected to begin the development process. All costs related to the initial development activities described in the provision were

to be borne by Hammes.  And it is reasonable to assume that Hammes (as the developer) would be the party knowledgeable about, and therefore responsible for, undertaking these activities.

More importantly, nothing obligated Hammes to begin the initial development process.  That is, the District would have had no recourse under the provision against Hammes if Hammes had chosen not to proceed with the initial development process.  It thus appears that Hammes' promise to begin the initial development process is illusory.  See Mattei v. Hopper, 51 Cal. 2d 119, 122 (1958) ("[I]f one of the promises [exchanged as consideration] leaves a party free to perform or to withdraw from the agreement at his own unrestricted pleasure, the promise is deemed illusory and it provides no consideration.").[1]

Notwithstanding the apparent illusory nature of Hammes' promise, the Court has found, as set forth above, that the parties intended to be bound by the Initial Development Costs provision.  The Court thus considers whether it is necessary to imply a covenant of good faith in Hammes' promise in order to create the mutuality of obligation required for an enforceable contract.  See Third Story Music, Inc. v. Waits, 41 Cal. App. 4th 798, 753 (1995).  The Court concludes such a result is necessary for two reasons: (1) without the covenant the provision would be, contrary to the parties' intentions, unenforceable for lack of consideration; and (2) nothing expressed in the provision is at odds with the covenant.  See id.

Based on the foregoing, the Court finds the Initial Development Costs provision was, at the time of execution, supported by sufficient consideration.  The Court will thus proceed to determining whether this provision was superseded upon execution of

---

[1] At this juncture, the Court dispenses with Hammes' contention that the District waived the affirmative defense of failure of consideration (illusory promise) by failing to raise the defense in the District's Answer.  Because the District raised the issue in the jointly submitted Pretrial Order, and because a pretrial order "generally supersedes the pleadings," the issue of whether the Initial Development Costs provision contains an illusory promise is now properly before the Court. Patterson v. Hughes Aircraft Co., 11 F.3d 948, 950 (9th Cir. 1993); N.W. Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d 918, 924 (9th Cir. 1988) (explaining that an affirmative defense is not waived through failure to raise it in a responsive pleading if it is included in a pretrial order).

1   the Ground Lease.

2       **C.    Novation**

3       Whether a contract supersedes an earlier contract is governed by the concept of

4   novation.  <u>See</u> <u>Alexander v. Angel</u>, 37 Cal. 2d 856, 860 (1951).  "Novation is the

5   substitution of a new obligation for an existing one." Cal. Civ. Code § 1530.  Novation

6   may be made in one of three ways: (1) by substituting a new obligation between the

7   same parties, with the intent to extinguish the old obligation; (2) by substituting a new

8   debtor in place of the old one, with the intent to release the latter; or (3) by substituting

9   a new creditor in place of the old one, with the intent to transfer the rights of the latter

10  to the former. <u>Id.</u> § 1531.

11      "The question whether a novation has taken place is always one of intention."

12  <u>Alexander</u>, 37 Cal. 2d at 860 (quotation marks & citation omitted).  "[T]he whole

13  question is one of fact and depends upon all the facts and circumstances of the

14  particular case." <u>Id.</u> (quotation marks omitted).

15      In examining an alleged novation, courts "first look to the agreements

16  themselves, and, specifically, the substance of the change or changes between the old

17  and new agreements." <u>Fanucchi & Limi Farms v. United Agri Products</u>, 414 F.3d

18  1075, 1082 (9th Cir. 2005) (citing <u>Alexander</u>, 37 Cal. 2d at 861-62).  "Courts may also

19  take into consideration the conduct of the parties." <u>Fanucchi</u>, 414 F.3d at 1082.

20  "Indeed, 'it is not necessary to meet and state either in writing or orally that the original

21  contract was rescinded.  If the intent to abandon can be ascertained from the acts and

22  conduct of the parties the same will result will be attained.'" <u>Id.</u> (quoting <u>Hunt v.</u>

23  <u>Smyth</u>, 25 Cal. App. 3d 807, 818 (1972)).

24      Novation generally requires the assent of all parties. <u>Alexander</u>, 37 Cal. 2d at

25  863.  This "broad generalization," however, "must be examined in the light of the

26  various situations that arise." <u>Id.</u>

27      Following novation, the parties' rights and duties are governed only be the new

28  agreement. <u>Id.</u> at 862.  The parties' failure to perform under the new agreement does

not "breathe new life into the dead and extinguished [agreement]." Id.

The party asserting novation must plead it either expressly or "by unequivocal implication." Id. at 860. It must be proved by clear and convincing evidence. Id.

The Court will first address whether the District sufficiently pleaded the defense of novation. Then, given that HC (not Hammes) was the entity that executed the Ground Lease, the Court will consider whether HC and Hammes should be treated as the same party for purposes of determining whether all parties assented to a novation. Finally, the Court will consider the substance of the LOI and the Ground Lease, along with the parties' conduct and the testimony offered at trial, to determine whether the parties intended a novation.

### 1. Pleading Requirement

The Court finds the District pleaded "by unequivocal implication" that the Ground Lease superseded the LOI. Alexander, 37 Cal. 2d at 860. In its answer to Hammes' Complaint, the District specifically denied "that the Letter of Intent was intended to operate as a binding, final expression of the parties' obligations." (ECF No. 15 ¶ 16.) The District pleaded that, "[t]o the contrary, the parties' obligations were governed by the later dated and binding Ground Lease." (Id.)

Furthermore, the District raised the issue of novation in the jointly submitted Pretrial Order as an issue of fact to be tried. (ECF No. 161 at 11.) Thus, even if the District did not expressly plead the issue of novation in its Answer, the issue is set forth in the Pretrial Order, which "generally supersedes the pleadings." Patterson, 11 F.3d at 950.

### 2. Hammes & HC Same Party

Because a novation generally requires the assent of all parties to a contract, Alexander, 37 Cal. 2d at 863, the District contends that Hammes and HC should be treated as the same party for purposes of determining whether the Ground Lease superseded the Initial Development Costs provision. As Hammes correctly notes, the Pretrial Order provides—as a fact that is neither admitted nor to be contested at

trial—that "Hammes and HC are separate entities." This, however, does not end the inquiry of whether Hammes and HC should be <u>treated</u> as the same entity for purposes of determining which party's assent was required for a novation.[2]

Generally, the equitable alter ego doctrine governs whether two separate entities may be treated as the same entity. <u>See</u> <u>RRX Indus., Inc. v. Lab-Con, Inc.</u>, 772 F.2d 543, 545-46 (9th Cir. 1985). The doctrine applies where "(1) such a unity of interest and ownership exists that the personalities of the corporation and individual are no longer separate, and (2) an inequitable result will follow if the acts are treated as those of the corporation alone." <u>Id.</u> (citing <u>Automotriz del Golfo de California S.A. de C.V. v. Resnick</u>, 47 Cal. 2d 792, 796 (1957); <u>U.S. Fire Ins. Co. v. Nat'l Union Fire Ins. Co.</u>, 107 Cal. App. 3d 456, 460 (1980)).

The alter ego doctrine applies equally to individuals, corporations, and limited liability companies that seek to evade responsibility for their actions. <u>Walsh v. Kindred Healthcare</u>, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011) (citing <u>Sonora Diamond Corp. v. Super. Ct.</u>, 83 Cal. App. 4th 523, 538 (2000); <u>People v. Pac. Landmark, LLC</u>, 129 Cal. App. 4th 1203, 1212 (2005)).

The following factors are considered when determining whether to apply the doctrine: (1) the two entities have essentially the same stockholders, directors, or ownership; (2) the two entities have engaged in transactions for no consideration; (3) the two entities have commingled funds; (4) one entity holds itself out as liable for the

---

[2] In discussing the general requirement that all parties must assent to a novation, the California Supreme Court stated that "such a broad generalization must be examined in light of the various situations that may arise." <u>Alexander</u>, 37 Cal. 2d at 863. The court stated, for example, that a new debtor cannot be bound without his assent, and that an old debtor cannot be discharged without the creditor's assent. <u>Id.</u> The court went on, however, to explain that where a novation is "presumably beneficial to the original debtor, no mention need even be made of the matter of his consent [citation], inasmuch as it may properly be assumed that he consents to the discharge although he still has a right of disclaimer. " <u>Id.</u> at 864.

Thus, even if Hammes and HC were treated as separate parties for purposes of determining whether the Ground Lease superseded the Initial Development Costs provision, Hammes—as the party with the original obligation to begin the development process and incur costs—would presumably be benefitted by the transferring of that obligation to HC. And it is beyond dispute that the District agreed to such a substitution. Accordingly, it is not clear that Hammes' assent to a novation was even required.

debts of the other; and (5) one entity is "simply an empty shell" used for the affairs of the other.  RRX Indus., Inc., 772 F.2d at 546; Roman Catholic Archbishop v. Super. Ct., 15 Cal. App. 3d 405, 411 (1971).

The Court finds that, while Hammes and HC are technically separate entities, they should be treated as the same entity for purposes of determining whether the Ground Lease superseded the Initial Development Costs provision.

First, the Court finds HC was merely an "empty shell" used by Hammes in the development of the Project.  Kraiss testified that HC "was to be the owner of the building to be developed," and that it would be the entity in which Hammes-affiliated investors, the District, and physician tenants would invest after the Project was completed.  (8/12 Tr. at 48, 70, 82.)  It is therefore clear that, until the Project was finished, Hammes was the entity pulling all the strings.  Indeed, on cross-examination, Kraiss testified that—notwithstanding HC's role as "Owner" of the Project—"Hammes was undertaking" the obligation to get leases with physician tenants.  (8/12 Tr. at 178.)

Second, it is clear that HC and Hammes shared the same bank accounts, that all of HC's accounting records (to the extent they existed) were kept within Hammes' own records, and that HC was severely undercapitalized.  Debra Cummings, Hammes' controller, testified that HC "does not have its own set of books, no tax ID, no tax return.  Hammes Company Healthcare has all the cost." (8/13 Tr. at 325.)  Cummings further testified: "HC Tri-City has no money, has no bank account, no means of paying anything."  (8/13 Tr. at 311, 327.)

Cummings testified that all development expenses were paid out of a "disbursing account" in the name of another, non-party Hammes-related entity: "Hammes Company of Wisconsin, Inc."[3]  (8/13 Tr. at 313.)  In explaining why she declared under penalty of perjury (in Trial Exhibit DT) that HC incurred around $900,000 in costs and that

---

[3] The fact that initial development costs were paid from an account owned by an entity named Hammes Company of Wisconsin, Inc.—not plaintiff Hammes—puts in doubt whether plaintiff Hammes incurred and/or funded any costs at all.  That, however, is an issue of damages that the Court does not reach.

Hammes separately incurred around $300,000 in costs, Cummings testified that, while the $900,000 in costs "ultimately would have gone to HC Tri-City," it never happened because the project never moved forward. (8/13 Tr. at 309.) Thus, "Hammes Company [was] actually paying [all of] these [costs] out of a checking account." (8/13 Tr. at 310.) Hammes, however, did not get its own checking account until 2008.[4] (8/13 Tr. at 315.)

Third, it is clear that third-party vendors perceived little to no difference between Hammes, HC, and other Hammes-related entities. For example, an invoice from the development expediting company named Lightfoot Planning Group is directed to HC. (Trial Ex. 66 at 1.) The same invoice, however, states it was sent in care of yet another, non-party Hammes entity: Hammes Company Healthcare West Coast, LLC. (Trial Ex. 66 at 1.) The same invoice also includes a "conditional waiver and release upon progress payment," which James Kobayashi (a Hammes employee) described as a document that waives the right to assert a mechanic's lien on the Project upon payment of the amount invoiced. (Trial Ex. 66 at 9; 8/12 Tr. at 287.) This waiver provides that the right to assert a lien would be waived upon receipt of payment from non-party Hammes Company Healthcare West Coast, LLC. (Trial Ex. 66 at 9.)

Trial Exhibit 91 is an invoice from the engineering company Hall & Foreman, Inc. that is directed to "Hammes Company," which, according to Cummings' testimony, is not an actual legal entity. (8/13 Tr. at 313.)

---

[4] Cummings declared in opposition to the District's Motion for Partial Summary Judgment that Hammes and HC separately incurred around $300,000 and $900,000 in costs, respectively. (Trial Ex. DT.) Only later did Cummings clarify that the $900,000 in costs attributed to HC were actually incurred by Hammes.

Similarly, Kevin Anderson, the person most knowledgeable as to the amount of initial development costs incurred by HC, testified that all architectural fees were incurred as an out-of-pocket cost of HC. (8/14 Tr. at 696.) This is starkly different than Hammes' position at trial, which is that it–not HC–incurred all costs.

It is apparent that, after Judge Sammartino found the Ground Lease null and void, Plaintiffs did an about-face regarding which entity actually incurred the initial development costs. The Court thus discounts the credibility of Hammes' assertion that the LOI was intended to survive the execution of the Ground Lease.

Page 1 of Trial Exhibit 92 is an authorization for additional services from Hall & Foreman, Inc. directed to "Hammes Company"; page 2 is a consulting agreement entered into between Hall & Foreman, Inc. and HC.

Trial Exhibit 93 is a geotechnical report prepared for HC, but stamped received by "Hammes Company." Page 1 of Trial Exhibit 107 is an environmental survey by Phase One, Inc., addressed to Craig Beam of HC, in care of "Mike Keller, Hammes Co." Page 2 of the same exhibit states the report was prepared for Phase One, Inc.'s client: HC. Similarly, Trial Exhibit 112, a design services agreement, states it is by and between the architecture firm Wood Burghard Swain Architects and HC.

In explaining why these documents refer to any number of Hammes-related entities, Cummings testified: "That's nothing abnormal. That is just vendors being confused. All the invoices are responsible for Hammes Company Healthcare to pay." (8/13 Tr. at 312.)

Based on the foregoing, the Court finds Hammes and HC shared "such a unity of interest and ownership" that the personalities of the two were not separate at the time the Ground Lease was executed. See RRX Indus., Inc., 772 F.2d at 545-46. Thus, in order for the alter ego doctrine to apply, the Court must decide whether an inequitable result would follow if Hammes and HC were treated as separate entities for purposes of determining whether the Ground Lease superseded the Initial Development Costs provision of the LOI. See id.

The Court concludes an inequitable result would follow if Hammes and HC were treated as separate entities. As set forth above, Hammes and HC did little to differentiate between their respective actions, assets, and obligations. This failure to distinguish between apparently separate entities was not limited to Hammes and HC. Invoices, for example, were sent to Hammes Company Healthcare West Coast, LLC or "Hammes Company," and–according to Cummings' testimony–were paid out of an account owned by Hammes Company of Wisconsin, Inc. It thus appears that Hammes, HC, and the other related entities lacked diligence in observing the corporate form and

yet are now claiming the protection of the corporate form in order to avoid an adverse finding of novation. The Court finds it would be inequitable to—on one hand—allow Hammes to assert it is indistinguishable from HC for purposes of claiming it (Hammes) incurred all initial development costs, but—on the other hand—assert it (Hammes) is separate and distinct from HC for purposes of avoiding the consequences of failing to perform under the Ground Lease.

In sum, the Court concludes Hammes and HC should be treated as the same entity for purposes of determining whether all parties assented to a novation. See Alexander, 37 Cal. 2d at 863. The Court thus proceeds to determining whether the parties intended the Ground Lease to supersede the Initial Development Costs provision. See id. at 860 ("The question whether a novation has taken place is always one of intention.") To do this, the Court will "first look to the agreements themselves," after which the Court will consider the "conduct of the parties." Fanucchi, 414 F.3d at 1082.

### 3.   Substance of LOI & Ground Lease

The initial paragraph of the LOI, entitled "Purpose," states:

> Although the parties intend to pursue final and legally binding agreements based on terms set forth in this Letter, this Letter is not intended, except for the provisions related to the parties' obligations with respect to the Initial Development Costs, to be a binding agreement but is intended merely as a statement of the present intentions and understandings of the parties and an outline of the economic and business terms fo the proposed transaction to determine whether there is a basis acceptable to the parties before proceeding toward final and binding agreements.

(Trial Ex. 1 at 1.)

The LOI then describes its object as "the development of an outpatient services and medical office building ("Building") containing ambulatory surgery, physician offices and potentially other ancillary services." (Trial Ex. 1 at 1.)

Turning to the Initial Development Costs provision of the LOI, it provides in full:

> The initial development process will entail incurring out-of-pocket costs related to but not limited to the following activities: (i) prepare architectural drawing as required to obtain necessary City entitlements, market the space to prospective tenants and for construction budgeting

purposes; (ii) have civil engineering analysis performed for the Project as required; (iii) have a traffic study prepared for the Project; (iv) have an environmental assessment conducted for the proposed site; (v) engage legal assistance to assist with public and regulatory approvals for the Project; (vi) pursue letters of intent or leases with prospective physician tenants for the Project; (vii) prepare boundary surveys and parcel maps (and/or subdivision plan or lot line adjustment maps) for the site; (viii) perform soil engineering studies for the Project; (ix) incur municipal submittal fees relating to the Project; (xi) engage a general contractor for preconstruction services; and (xii) engage an attorney for the completion of all legal documentation related to the project [sic] (ground lease, cross access easement, etc.).

Costs related to these activities, along with other reasonable out-of-pocket initial development costs that have been pre-approved by District in writing shall be collectively referred to as "Initial Development Costs". The "Initial Development Costs" shall be limited to reasonable out-of-pocket costs paid by Developer to third parties.

Developer will fund the Initial Development Costs as they are incurred. In the event the Project fails to proceed for any of the following reasons, District agrees to reimburse one hundred percent (100%) of Developer's out-of-pocket Initial Development Costs within thirty (30) days of receiving invoices for such costs.

    1.    District decides at its sole discretion not to proceed with the Project.

    2.    District decides not to proceed with the ambulatory surgery center or reduces the scope of the surgery center in such a way that jeopardizes the feasibility of the Project.

In the event the Project fails to proceed due to an inability to secure financing for the project [sic], or the Projects [sic] fails to proceed due to an inability to secure Necessary City approvals, including but not limited to conditional use permits and campus parking plans cannot be obtained, Developer and District agree to share equally (50% each party) the Initial Development Costs. Under such a circumstance, District agrees to reimburse Developer an amount equal to 50% of the out-of-pocket Initial Development Costs as defined above.

Developer shall provide District with monthly reports on out-of-pocket expenses incurred in connection with the Project. Developer and District each agree to promptly notify the other party if it determines that the Project cannot proceed for any reason. Provided that the Project does proceed, Developer will be reimbursed its out-of-pocket Initial Development Costs from the construction loan and District shall not be liable for any Initial Development Costs.

Developer shall not exceed $75,000 in Initial Development Costs until such time as Developer has been notified in writing by District that the Joint Venture Ambulatory Surgery Center Offering has either closed or that District is confident that the Offering will close and is willing to release Developer to exceed the temporary $75,000 cap.

(Trial Ex. 1 at 5-6.)

Turning to the Ground Lease, the Court begins with the Ground Lease's Recitals, which are described as the "facts, understandings, and intentions of the parties." (Trial Ex. 2 at 2.) Recital B provides that HC is leasing land from the District "for purposes of constructing, owning and operating thereon an ambulatory surgery center and medical office building." (Id.) The Ground Lease defines the ambulatory surgery center and medical office buildings as the "Improvements" to the premises. (Id.)

Article 4 of the Ground Lease governs the use of the premises. (Trial Ex. 2 at 11.) Section 4.2 provides: "The Ground Leased Premises and the Improvements shall be used solely for the purpose of the erection, maintenance and operation of a medical office building and the provision of other health care items and services approved by the Lessor." (Id. (emphasis added).)

Article 15 of the Ground Lease provides that neither HC nor the District would be obligated to perform under the Ground Lease "until and unless" (1) HC obtained financing for the Improvements, (2) HC entered into leases with physician tenants covering not less than 70% of the rentable square feet of the medical office building, and (3) HC exercised commercially reasonable efforts to obtain all required governmental approvals for the development and construction of the Improvements.[5] (Trial Ex. 2 at 41-44.)

Despite it being used throughout Article 15, (see Trial Ex. 2 at 42-43), the term "Initial Development Costs" is first defined under Article 4's provisions regarding the parties' obligations to indemnify one another in connection with hazardous materials on the premises, (id. at 20). This is perhaps another example of "poor draftsmanship" noted by Judge Sammartino. (ECF No. 85 at 12.) In any event, the Ground Lease defines "Initial Development Costs" as:

> all reasonable out-of-pocket expenses incurred by [HC] directly related to development of the Ground Leased Premises as the same are substantiated by [HC] including, but not limited to, expenses relating to: the preparation of architectural drawings; civil engineering; traffic

---

[5] Indeed, it was HC's failure to satisfy the pre-leasing contingency that led Judge Sammartino to find the Ground Lease "null and void." (ECF No. 85 at 11-15.)

studies; environmental assessments; legal assistance to assist with public and regulatory approvals; negotiation of letters of intent and leases with prospective physician tenants; surveys, parcel maps and subdivision maps; soils engineering studies; municipal submittal fees; preconstruction services provided by a general contractor; attorneys' fees for the completion of all legal documentation related to the project including, but not limited to, the ground lease; all additional Rent paid from and after the Effective Date, and other reasonable out-of-pocket expenses to the extent such other expenses have been pre-approved by [the District] in writing.

(Trial Ex. 2 at 20.)

Returning to Article 15, the term "Initial Development Costs" is used in connection with each of the three conditions precedent described above.  (Id. at 42.) Section 15.1, which addresses the financing contingency, provides that, in the event HC declares the Ground Lease null and void due to an inability to obtain satisfactory financing, then the District "shall promptly reimburse [HC] for fifty percent (50%) of [HC]'s Initial Development Costs."  (Id.)

Section 15.2, which covers the pre-leasing contingency, provides that, in the event HC fails to enter into leases covering at least 70% of the Project's rentable square feet, HC may, among other things, terminate the lease.  (Id. at 43.)  Section 15.2(b)(3) provides:

In such event, [HC] shall thereupon assign to [the District] all of its rights, title and interest with respect to the plans and [the District] shall reimburse [HC] for [HC]'s reasonable Initial Development Costs incurred by [HC] directly related to development of the Ground Leased Premises, as the same are substantiated by [HC].

(Id.)

Section 15.3, which sets forth the government approvals contingency, provides that, in the event HC declares the Ground Lease null and void due to its inability to obtain all required governmental approvals, the District "shall promptly reimburse [HC] for fifty percent (50%) of [HC]'s Initial Development Costs."  (Id. at 44.)

Considering the language of the two agreements, the Court finds, as a broad proposition, that the LOI was intended as a stop-gap measure until the parties could reach a "final and legally binding" agreement.  This is evident from the unambiguous language of the LOI, stating that the parties intended to pursue a final and legally

binding agreement in the future.  It is further supported by the fact that the parties intended only one provision from the nine-page document to be binding: the Initial Development Costs provision.  Moreover, the only "final and legally binding" agreement entered into after the parties executed the LOI was the Ground Lease.  Thus, as a preliminary matter, the Court finds a strong indication that the Ground Lease was the "final and legally binding agreement[]" anticipated in the LOI.

Moving on to the substance of the two agreements, the Court finds they share the same subject matter.  The LOI pertains to the development and construction of a medical office building and an ambulatory surgery center.  The Ground Lease provides that its purpose is for the construction of a medical office building and ambulatory surgery center.  Indeed, the Ground Lease provides that the leased premises may be used "solely" for this purpose.

The Court further finds that the "Initial Development Costs" described in the LOI are the same "Initial Development Costs" described in the Ground Lease: (1) architectural drawings, (2) civil engineering, (3) traffic studies, (4) environmental assessments, (5) legal assistance with public and regulatory approvals, (6) pursue/negotiate letters of intent and leases with prospective physician tenants, (7) surveys and parcel/subdivision maps, (8) soil engineering studies, (9) municipal submittal fees, (10) engage general contractor for preconstruction services, (10) attorney fees for the completion of all legal documentation related to the project, including the Ground Lease, and (11) other reasonable out-of-pocket costs as approved by the District.[6]

Further, while the circumstances under which the District was to reimburse Initial Development Costs varied slightly, the crux of the reimbursement provisions in both agreements was to protect Hammes in the event that the Project did not come to

---

[6] The Ground Lease contains one additional cost not set forth in the LOI: the rents paid under the Ground Lease up until any termination of the project that would require the District to reimburse a portion of HC's Initial Development Costs.  The Court finds this additional cost does not detract from the nearly identical nature of the costs described in the two agreements.

fruition.

Finally, the Court notes that Section 14.8 of the Ground Lease provides that it "contains the entire agreement between the Parties <u>regarding the subject matter hereof</u>. Any oral or written representations, agreements, understandings and/or statements shall be of no force and effect." (Trial Ex. 2 at 40 (emphasis added).)  The "subject matter hereof" is, as described above, the construction and operation of a medical office building and ambulatory surgery center—the same subject matter as the LOI.

In short, the Court finds that the substance of the LOI and Ground Lease demonstrates that the parties intended the Ground Lease to be the primary agreement governing their relationship.  After the parties signed the LOI, they entered into no other formal agreement except for the Ground Lease.  It is thus logical to conclude that the parties intended the Ground Lease to be their final agreement because, without it, Hammes and HC would have effectively been developing a million-dollar project without any agreement at all except for a single provision in a single letter of intent. Having reached this conclusion, the Court will turn to the parties' conduct and to the testimony offered at trial.

### 4.    Conduct & Testimony

The parties' conduct and the testimony offered at trial demonstrates that the parties intended the Ground Lease to be the final and exclusive agreement governing the development of the Project.

Pam Smith, the District's Director of Development, testified that the two individuals who represented Hammes in drafting and executing the LOI (Craig Beam and Jason Cook) said that the LOI "would provide some protection to Hammes in case the ground lease was not subsequently signed." (8/13 Tr. at 431.) Smith explained that Hammes was worried about the unpredictability of the District's board of directors and thus wanted the LOI to be in place "if all was going good, the project was feasible, and both companies were in pursuit, but yet the board acted in some odd fashion to not proceed with the ground lease." (8/13 Tr. at 430.)

1   Smith herself understood the Ground Lease as being the sole agreement
2   governing the development of the Project. In a presentation to the District's board of
3   directors, for example, Smith discussed the District's obligation to reimburse initial
4   development costs under the Ground Lease, not the LOI. (Trial Ex. 31 at 3; 8/14 Tr.
5   at 499.)

6   Gonzalez testified that the parties negotiated terms that were material to the
7   Project after the parties signed the LOI. Gonzalez testified, for example, that Hammes
8   approached the District after the LOI was executed to discuss prevailing wage issues
9   related to the Project. (8/12 Tr. at 167.)

10   Kevin Kraiss, when asked whether the letters of intent in general are affected by
11   subsequent ground leases, testified only that letters of intent are typically binding with
12   regard to initial development costs. (8/12 Tr. at 50.) He thus avoided answering the
13   question of whether and, if so, how ground leases affect letters of intent in development
14   projects such as this one.

15   Trial Exhibits CM and CS are letters from Todd Kibler on behalf of HC written
16   on "Hammes Company" letterhead. These letters pertain to the termination of the
17   Ground Lease and demand reimbursement under the Ground Lease for Initial
18   Development Costs. Attached to the letter admitted as Exhibit CM is a document
19   entitled, "Termination of Ground Lease and Mutual Release," which was prepared by
20   Kibler. (8/14 Tr. at 526.) In the termination and release, HC seeks 50% of its Initial
21   Development Costs—an amount totaling $435,780.50.[7]

22   While it seems that Hammes representatives presented the LOI to District
23   officials in an April 2009 meeting, (8/13 Tr. at 273), Hammes did not thereafter claim
24   it was owed reimbursement under the LOI in the letters that were sent to the District
25   in May and June 2009. In June 2009, for example, Kevin Anderson (another Hammes

---

27   [7] The Court notes that 100% of these costs would be $871,561, which is roughly the amount
of Initial Development Costs Hammes claimed as its own during trial. (See Trial Ex. 83 at 3.) This
28   further supports the Court's conclusion that, after Judge Sammartino found the Ground Lease null and
void, Plaintiffs did an about-face regarding which agreement governed the reimbursement of Initial
Development Costs. (See n.4, supra.)

employee) sent a letter to Pam Smith, stating that, while HC was not obligated to do so under the Ground Lease, HC would be willing to give the District the project documents upon the District's "payment in full of all costs incurred by HC in connection with the preparation of the project documents." (Trial Ex. CQ at 2.)

Pam Smith testified that, during this time frame, she never received a letter from Kibler on behalf of Hammes, she never received an invoice from Kibler on behalf of Hammes, and that Kibler never informed Smith that it was Hammes that had incurred the initial development costs. (8/14 Tr. at 523, 525, 533.) Indeed, at trial, Hammes offered no credible evidence that an invoice was sent from Hammes to the District for initial development costs.[8]

Hammes' failure in mid-2009 to claim costs under the LOI makes some sense because, when presented with the LOI in April 2009, Larry Anderson (the CEO and President of the District following Gonzalez' termination) asserted his belief that the Ground Lease superseded the LOI. (8/13 Tr. at 283.)

Finally, there is the issue of timing. The Ground Lease was effective as of July 3, 2007, while the LOI was effective as of May 5, 2005. Thus, there is a period when Hammes would have incurred costs only under the Initial Development Costs provision of the LOI. The unambiguous language of the Ground Lease, along with the parties' understanding that the Ground Lease was to be their final and exclusive agreement, however, demonstrate that even those Initial Development Costs that were incurred prior to execution of the Ground Lease were recoverable thereunder.

In sum, the Court finds that the parties intended the Ground Lease—and not the LOI—to be the complete and exclusive agreement governing the development of the Project. As such, the Court concludes that the parties intended the Ground Lease to

---

[8] Kraiss testified that he did not recall whether such an invoice was sent. (8/12 Tr. at 195.) And, while Cummings testified that such an invoice was sent, (8/13 Tr. at 313-14), she knew nothing else about such an invoice, (id. at 314).

supersede the LOI and that the LOI is therefore unenforceable.[9]  While unfortunate for Hammes, the failure to perform under the Ground Lease by satisfying the pre-leasing condition does not "breathe new life into the dead and extinguished" LOI.[10]  <u>Alexander</u>, 37 Cal. 2d at 862.

<u>**CONCLUSION**</u>

After a careful consideration of the evidence admitted at trial and the parties' arguments, and for the foregoing reasons, the Court hereby finds in favor of the District.  The Clerk of Court is therefore directed to enter judgment in favor of Tri-City Healthcare District and against Hammes Company Healthcare, LLC on Hammes Healthcare Company, LLC's claim for breach of contract (Letter of Intent).

**IT IS SO ORDERED.**

DATED:  January 8, 2014

HON. GONZALO P. CURIEL
United States District Judge

---

[9] Even if the the Initial Development Costs provision of the LOI were enforceable, the Court finds the District did not terminate the Project in its sole discretion or jeopardize the feasibility of the Project.  In addition to the failure to satisfy the pre-leasing contingency in the Ground Lease which nullified the only agreement that allowed the medical office building and ambulatory surgery center to be constructed on the District's campus, (ECF No. 85), the strongest evidence of the fact that the District did not terminate the Project in its sole discretion or frustrate the Project's feasibility are the letters that Todd Kibler sent to the District stating that HC agreed to a "mutual termination" of the Ground Lease.  (Trial Ex. CM at 1.)

[10] As an additional ground for finding the LOI unenforceable, the Court relies on the parol evidence rule.  The parol evidence rule "prohibits the introduction of extrinsic evidence, whether oral or written, to vary the terms of an integrated written agreement or to add terms to an integrated agreement that is also intended as a complete and exclusive statement of the parties' agreement." <u>Pac. State Bank v. Greene</u>, 1 Cal. App. 4th 375, 383-84 (2003); Cal. Code Civ. Proc. § 1856.  Because the Court finds that the parties intended the Ground Lease to be the complete and exclusive agreement governing the Project, the Court finds that the Initial Development Costs provision of the LOI–a prior written agreement–cannot be used to add additional bases under the Ground Lease for recovering Initial Development Costs.